(No. 34683.—

*In re* BENJAMIN M. BECKER, Attorney, Respondent.

*Opinion filed May 22, 1959.*

BRISTOW, HERSHEY, and KLINGBIEL, JJ., concurring.

CHARLES LEVITON, of Chicago, *amicus curiae*.

DON PEEBLES, ROBERT A. SPRECHER, and FRANK A. KARABA, all of Chicago, for respondent.

Mr. JUSTICE HOUSE delivered the opinion of the court:

The board of managers of the Chicago Bar Association upon a review of a report of the entire committee on grievances, sitting as commissioners under Rule 59, filed a report wherein they found the respondent guilty of unprofessional conduct, dismissed 14 of the committee's 22 specifications of misconduct and recommended censure by this court. Respondent has filed exceptions to the report.

The charges arise out of respondent's participation in zoning matters as an attorney for private interests while

occupying the position of alderman of the city of Chicago. He is accused of representing conflicting interests, division of fees for legal services not based upon a division of services or responsibility, and failure to represent the public with undivided fidelity.

Much of the alleged misconduct involves respondent's relationship with Maurice Blonsley, an attorney and close friend, during the period in which the complaints arose. Blonsley assisted respondent in the latter's successful campaign for alderman in 1947. After the election respondent opened three offices in his ward where constituents could call upon him. Blonsley helped take care of their problems, and respondent referred a large amount of law business to him. In 1951 they had political differences and their cordial relationship terminated. Respondent became a candidate for city clerk in December, 1954, whereupon Blonsley divulged information to a Chicago newspaper relative to their relationship. Thereafter, several articles about respondent's connection with zoning matters appeared, including photographic reproduction of checks. Respondent thereupon requested the Chicago Bar Association to investigate his conduct, and a special investigating committee of the bar was appointed. The committee filed a complaint with the committee on grievances. Respondent resigned as a candidate the day after he was served with a copy of the complaint.

We think the best approach is to examine each type of practice which allegedly constitutes unethical conduct rather than consider the specifications in numerical order, since some specifications allege more than one infraction.

*Amicus curiae* contends that an alderman, as an elected member of a legislative body, represents conflicting interests when he accepts employment from private interests in cases before the courts where his municipality is a party. He makes a like assertion of conflict with respect to an alderman's appearance before administrative officers or bodies

set up by the city. His theory is that the lawyer-member of a legislative body stands in a fiduciary relationship with it and any representation of private interests is unethical *per se*.

Respondent allegedly participated, and did receive fees, in three declaratory actions wherein the city of Chicago was a party. Under count XIX Ward Baking Company was desirous of using certain premises for a garage but could not do so under the prevailing zoning classification. Upon recommendation of respondent, one Nathanson was employed as counsel, the restriction was declared unconstitutional as to the garage property and Nathanson was paid a fee of $4,500, from which respondent was paid $1,300. Count XX involved a zoning problem of Accurate Threaded Fasteners, Inc. Respondent was approached and after stating that he did not make a practice of obtaining variations or handling rezoning, suggested that legal action was the only redress and recommended several attorneys, including Nathanson. The company's attorney retained Nathanson, a declaratory judgment suit was successful and Nathanson was paid a fee of $3,000, $1,000 of which he paid to respondent. Count XXII involved a successful declaratory judgment action upon behalf of Lincoln Village Shopping Center wherein Blonsley was paid a fee of $2,000, of which respondent received at least $800.

We are of the opinion that there is nothing unethical in a lawyer-member of a legislative body appearing in litigation wherein his governmental unit is a party, even in cases where acts of that body are sought to be held unconstitutional. The court has complete jurisdiction and its determination is made without reference to the actions or desires of the legislative body or any individual member thereof. There is no Illinois precedent to the contrary, nor is such practice prohibited by the Canons of Ethics. Canon 49 applies "to the promotion or defeat of legislative or other matters proposed or pending before the public body

of which he is a member," not to ordinances or statutes after their passage. To hold otherwise would cause able, ethical and distinguished legislative members of our bar to hesitate before accepting cases in fields of the law in which they have traditionally practiced. What we have here said is subject to later comment upon the propositions of disclosure of employment and a division of responsibility or services.

Four counts of the complaint involved separate cases of businesses procuring variations of the Chicago zoning ordinance. During the period of their procurement, the zoning board of appeals was authorized to hear variations from zoning regulations, and to make recommendations to the city council, which had the power to grant or deny the variation. It was the practice of the board to send notice to the alderman of the appropriate ward when an application was filed. Such recommendations were referred by the city council to its building and zoning committee, and its actions in variation matters were customarily followed by the city council. The pattern was practically identical in the following specifications: count VII covered Diebel Tool and Dye Company, count X related to Dandy Screw Products Co., and count XV concerned the candy business variation of one Samuel I. Reis. Respondent was contacted, he recommended Blonsley as an attorney to help the parties with their variation requests, Blonsley appeared on their behalf and the variations were granted. In each case respondent was accused of receiving a portion of Blonsley's legal fee, but he denied having been paid. It was urged by respondent that Blonsley's testimony was unworthy of belief. The commissioners found that Blonsley's testimony was not believable, and held that where respondent denied Blonsley's statements, such statements would not be considered. They then dismissed 14 of 22 specifications. By accepting the view of the commissioners, it thus appears

that respondent was not found guilty of accepting fees in the three counts last referred to above.

The commissioners findings with respect to counts VII, X and XV were that respondent had violated Canons 6 and 49. In count VII (Diebel Dye) they found that respondent had virtually forced Diebel to obtain assistance from him, directly or indirectly; in count X (Dandy Screw Products) their finding was that previously a variation had been referred to Blonsley and that the company "reasonably inferred" that it must contact respondent in a subsequent zoning matter; and in count XV that Reis was led to believe he must hire and pay Blonsley in order to secure a variation. The conclusions from their findings were that respondent as a lawyer in public office was obligated scrupulously to avoid any action from which it might be inferred that he was using his office in a manner inconsistent with his duty to the public, and that his actions were inconsistent with his duty to represent the public with undivided fidelity.

The use of force, intimidation or coercion for personal gain by such a public officer is obviously unethical and a lawyer who employs such tactics is subject to severe disciplinary action. While there is a strong inference of coercion by the respondent, we are of the opinion that the record does not establish it with sufficient clarity to substantiate the charge.

When these three specifications are stripped of (1) actual participation in the matter as a lawyer, and (2) sharing of fees, which was done by the findings of the commissioners, coupled with our finding that coercion was not proved, all that is really left is a lawyer-alderman recommending a favored lawyer friend. True, respondent may have hoped for reward through business and fees in other fields; in fact, he admitted that he worked with and received fees from Blonsley in many other matters not connected with the city, but that alone, without other substan-

tial corroborating proof, will not sustain the charge. It is a matter of common knowledge that advice is sought and received from an alderman daily. This is particularly true in a large city such as Chicago. It is unrealistic to expect him to turn his back on a constituent seeking advice as to legal counsel. There is little doubt that his recommendations of counsel were biased, but in these days of specialization in the professions, recommendations are made daily by professional men based partly upon ability, but undoubtedly elements of friendship, hope for reciprocity and like considerations have some bearing. We do not feel that recommendation alone to a constituent by a lawyer-alderman merits disciplinary action.

The next question is whether a lawyer-member of a legislative body may appear as counsel or co-counsel at hearings before a zoning board of appeals, or similar tribunal, created by the legislative group of which he is a member. We are of the opinion that he may practice before fact-finding officers, hearing bodies and commissioners, since under our views he may appear as counsel in the courts where his municipality is a party. Decisions made at such hearings are usually subject to administrative review by the courts upon the record there made. It would be inconsistent to say that a lawyer-member of a legislative body could not participate in a hearing at which the record is made, but could appear thereafter when the cause is heard by the courts on administrative review. This is subject to an important exception. He should not appear as counsel where the matter is subject to review by the legislative body of which he is a member. "A public officer owes an undivided duty to the public whom he serves, and is not permitted to place himself in a position which will subject him to conflicting duties or expose him to the temptation of acting in any manner other than in the best interests of the public." (43 Am. Jur. 81, Public Officers, sec. 266.) We are of the opinion that where a lawyer does so appear

there would be conflict of interests between his duty as an advocate for his client on the one hand and the obligation to his governmental unit on the other.

Count XVIII involves a situation within the foregoing exception. Respondent had represented the Berteau-Lowell Plating Works since 1939 or 1940. He appeared as counsel in the municipal court on two occasions and his law firm then filed an application for variation before the zoning board of appeals. At that time the board was authorized to hear applications for variation and to make recommendations to the city council, which had the power to grant or deny the variation. Respondent personally presented the case to the board and it recommended relief. He spoke to the alderman from the ward wherein his client's property was located and informed him that it was coming through the council. It was unanimously passed by the city council, with respondent voting in favor, and he received a fee of $350 for his services. Based upon the foregoing facts, which respondent does not deny, the commissioners found that he had violated Canons 6 and 49 by representing conflicting interests, and failing to represent the public with undivided fidelity by taking legal employment involving a matter which he knew he would have to pass upon as an alderman.

Respondent argues that he had represented Berteau-Lowell long before he became alderman and should be permitted to continue. There is no merit to this argument. When a lawyer accepts a public office he takes it not only with its prestige and emoluments, but with its burdens and duties as well. The fact that he had represented this client prior to his election does not remove the conflict. The only way to avoid the conflict is to no longer represent clients whose interests oppose those of the public that he represents. When he chose to become an alderman he became obligated to represent the city with undivided fidelity.

Respondent introduced considerable evidence to the

effect that the approval of a variation by the city council was a purely formal action, that it was a generally accepted fact that it was purely a "rubber-stamp" requirement, and that therefore there was no conflict of interest. The answer is that a lawyer's actions should be free from temptation and suspicion in accepting employment where interests might conflict. The impropriety of undertaking inconsistent duties is not only gauged by the fact that his intentions and motives are honest but also by the suspicion with which his acts may be viewed by the public. It is unnecessary that he be guilty of an actual betrayal of confidence. It is enough that he places himself in a position which leaves him open to the charge. (See *People* v. *Gerold*, 265 Ill. 448.) Activities of a lawyer which tend to bring the legal profession into disrepute have long been held to be grounds for disciplinary action. (*People ex rel. Chicago Bar Association* v. *Meyerovitz*, 278 Ill. 356; *In re Serritella*, 5 Ill.2d 392.) In our opinion his representation of Berteau-Lowell conflicted with his duties as an alderman, and tended to bring the legal profession into disrepute.

Count XXI involved an appeal by the Chicago Dunbrik Co. from the building commissioner to the board of zoning appeals in which respondent acted as co-counsel with Blonsley. As we understand it, the procedure here differs from that of variations in that recourse is to the courts rather than to the city council. This case, therefore, does not fall within the prohibitory exception above noted, but comes within the category of appearances before hearing bodies or commissions, which we have heretofore indicated is permissible. Count XXI does raise other alleged infractions which have the question of the division of fees as the common denominator with count XIX (Ward Baking), XX (Accurate Threaded Fasteners) and XXII (Lincoln Village Shopping Center).

In each of the foregoing counts the commissioners found that respondent had violated Canon 34, which reads: "No

division of fees for legal services is proper except with another lawyer, based upon a division of service or responsibility." We have some difficulty in following the reasoning leading up to such a conclusion. In the specifications which found a violation of Canon 34 under counts XIX and XX the statement is made in each that "respondent, by his own admission actively participated in the declaratory judgment case and received a portion of the fee paid." These findings negate the earlier findings in the same paragraph that there was a violation of the fee-splitting Canon. The evidence with respect to like charges under counts XXI and XXII was not entirely satisfactory.

A lawyer who is a public officer should be particularly careful to strictly observe the admonition of Canon 34. His public position may be such as to give him opportunities for referral of business far beyond that of other members of his profession. To split fees without a proportionate division of service or responsibility would not only be a violation of the Canon, but would violate the very essence of ethical conduct and take on attributes akin to those usually associated with the unsavory words "pay-off." There are but few ways by which a lawyer could bring discredit upon the profession more quickly. However, we do not feel that the charges under counts XXI and XXII were sustained by the evidence.

The record is not so clear with respect to some of the fourteen counts dismissed by the board of managers. There is more than a suspicion that respondent participated in fees in which he did nothing more than make a referral. The same is true of count VII. There, Blonsley was paid a fee of $300 and he paid $150 to respondent. The latter admitted receiving that amount but denied that it referred to the Diebel matter. We do not mean to be critical of the board of managers' action in refusing to accept Blonsley's testimony except where corroborated, since he was thoroughly discredited. Undoubtedly, they were impressed,

as are we, with the quality and quantity of the witnesses who testified to respondent's reputation for honesty and integrity, and the fact that there is no dispute that he possesses a fine reputation and high standing in the community. Since we have found respondent to be subject to disciplinary action, no useful purpose would be served in detailing the charges and proofs contained in the counts which were dismissed. Even if we found the charges warranted, they would merely be cumulative.

One other matter deserves comment. What we have heretofore approvingly said with respect to a lawyer-member of a legislative body practicing before the courts and administrative bodies should be subject to the restriction that where he is co-counsel public disclosure of his participation is essential. If he expects to participate in litigation and share a fee, the record should so show and the client should have knowledge of such fact. While disclosure would make representation no more ethical, failure to disclose would create temptation and foster suspicion. Furthermore, his activities would then be subject to the bright light of public opinion.

It was charged that in several instances respondent failed to appear of record as co-counsel, where he shared in a fee. In at least one count (XX Accurate Threaded Fasteners) we believe the record bears out the finding that the client was not informed of his participation in the case or the sharing of the fee. Respondent argues that lawyers are often retained as co-counsel without the knowledge of the client and that his position is no different from that of lawyers generally. We think this prohibition applies peculiarly to lawyer-members of legislative bodies because of their responsibility to the public. Since we have not heretofore had occasion to pass upon this particular point, we will not discipline for failure to disclose employment in this case, but our view will serve for the guidance of the bar in the future.

Respondent complains that counts XXI and XXII were improperly added at the close of the proofs. He contends that the matters charged therein were considered by the special committee of inquiry, which chose not to include them in the complaint, and that the failure to include them constitutes a bar to the "reopening" of the matters before the commissioners. It is argued, further, that they are not sufficiently clear and specific and that they introduce new matter not within the original complaint. The contention cannot be sustained. Count XXI simply alleged that on June 30, 1948, respondent received from Blonsley a check for $450, representing his share of legal fees in connection with the appeal to the board of zoning appeals in the Chicago Dunbrik Company matter; and count XXII alleged that on December 10, 1948, he received a check from Blonsley for $800, as a division of legal fees in a suit for declaratory judgment holding a zoning ordinance invalid as applied to the property of Lincoln Village Shopping Center. The allegations are sufficiently clear. Moreover, both checks were referred to in his own brief filed with the special committee, the charges are substantially uncontroverted in the evidence, and there is no offer of proof in opposition thereto. Respondent was not prejudiced by the addition of the two counts. A disciplinary proceeding is not a lawsuit with formalities of pleading, nor can technicalities be invoked to defeat the charges where undisputed facts show conduct which is ethically wrong. (*In re Hamilton*, 388 Ill. 589; *In re Sanitary District Attorneys*, 351 Ill. 206.) The point is academic in any event, since we have found no unethical conduct under either count.

So far as we are advised this court has not heretofore been called upon to judge the propriety of practices such as those presented by this record, but the principles involved have long been firmly established. Any conduct of a lawyer which necessarily tends to bring discredit upon the profession is an abuse of the privilege secured to him by his

license. "It is vital to the well-being of society and the administration of justice that attorneys, who are officials of the court and a part of our judicial system, should maintain the most scrupulous care in conducting themselves, and should discharge their duties in such manner as will secure and preserve the respect and confidence of the public." (*In re Clark,* 8 Ill.2d 314.) It is readily apparent that whether a case such as this has previously been presented does not affect the fact that standards exist by which the conduct of lawyers in public office may be tested, (*In re Sanitary District Attorneys,* 351 Ill. 206, 220,) and that under those standards certain conduct of respondent heretofore pointed out cannot be condoned.

Insofar as the record shows, the matters in question were handled competently and no harm was intended to the public. In addition, it is undisputed that respondent's reputation, both personally and professionally, is good. We agree with the commissioners that he was not guilty of conduct warranting disbarment or suspension, but some of his actions were such as tend to bring the legal profession into disrepute. The recommendation of the commissioners is appropriate and respondent is, accordingly, censured.

*Respondent censured.*

Mr. Justice Bristow, concurring:

The report of the entire committee on grievances of the Chicago Bar Association, sitting as commissioners of the court, found that respondent had been guilty of unprofessional conduct on twenty-two different specifications and recommended a suspension for two years. The board of managers, on a thorough consideration of the record, dismissed 14 of the 22 specifications, and as to the remaining eight recommended disciplinary action in the form of censure. Now, the majority opinion finds nothing in the record that denotes a lack of integrity but holds that, because of a course of conduct that was only mildly irregular, he should be censured. I am not altogether in disagreement

with that result but the manner in which it is reached is what troubles me.

The majority opinion has not adequately portrayed the eminence of the respondent as a lawyer and a political leader. He graduated from DePaul Law School in June, 1934, after a struggle to overcome many hardships and disadvantages. In 1942 respondent became associated with Levinson, Becker, Peebles and Swiren. His active practice of law with this group gave him wide and valuable experience. Respondent remained with that firm until his election as alderman in the 40th ward, Chicago, in April, 1947, whereupon be became associated with Bernard Savin in the practice of law.

The respondent has written many legal articles on subjects of taxation and estate planning. He contributed an entire chapter in a two-volume set entitled "Preparing and Trying Cases in Illinois" sponsored by the Illinois State Bar Association. He was executive director of the DePaul University Institute on Federal Taxes and editor of its published proceedings. He has lectured on the subject of Federal taxes at the Lawyers Post-Graduate Clinic given at Chicago University. He was active in independent groups of the city council of Chicago, which had for their purpose the improvement of local government. His most important public service was evident as a member of the Chicago Home Rule Commission, appointed by Mayor Kennelly to formulate recommendation for modernizing Chicago's city government. Harland Stockwell, executive secretary of the Civic Federation of Chicago, which is known as the people's watchdog of government in Illinois, testified: "I have dealt with hundreds of public servants in my job and I think I am a good judge of their moral and intellectual integrity, and I put respondent at the very top of men I have known among public servants. He has ability and above all, intellectual integrity, in my opinion."

At the time of the difficulties that these proceedings

posed, respondent was unquestionably on his way to greater political recognition. The pertinence of these observations will appear subsequently.

Turning now to the report of the board of managers and the committee on grievances as commissioners, where 14 counts were found not to have been sustained by the evidence, we have this uniform finding: "Blonsley's malice, his refusal to testify fully, his refusal to produce his books and records, the impeachment of his testimony, and his general behavior as reflected in the record, the Commissioners find that his testimony in this proceeding is not acceptable; that, therefore, the charges were not established, as required by law, by clear and convincing proof." I shall quote from the report as to what they have to say with reference to count II, which is typical of the 14 charges that were dismissed. "On March 27, 1947, Eugene C. Jachimowski, a lawyer representing Joseph Piech, filed an application for a zoning variation for the property at 3000-3008 Elston Avenue, in the 40th Ward. Jachimowski testified that before that, the then alderman, Samuel Gurman, had after an investigation advised him, Jachimowski, that Gurman was satisfied that the community would welcome such a variation. After the application had been granted and an ordinance passed consonant therewith, it appeared to be necessary to file an amendment so as to have the variation appear in the name of the lessee rather than that of the owner. Jachimowski testified that following the filing of this amended application, Blonsley telephoned him and said the application was not meeting with the favor of the constituents of the ward, that if Jachimowski wanted to succeed, he would have to use Blonsley, since Mr. Gurman was now deceased. He testified further that thereafter he paid Blonsley a fee, the application was apprvoed by the Board of Zoning Appeals and passed by the Council. Jachimowski had never made contact with respondent directly, although Blonsley gave him the impression that he

was respondent's representative and in position to make trouble. Jachimowski then wrote to Blonsley employing him as co-counsel, on May 9, 1947. On May 13, 1947, Blonsley wrote to respondent advising him that there had been objection to the proposed use, that the application had been taken under advisement, that the matter would come to respondent's attention before the City Council, and that Blonsley would appreciate any courtesies extended by respondent in securing passage of the variation. On June 17, 1947, Blonsley wrote another letter to respondent telling him that although the application had been approved by the Board, no action had been taken in the Council and that it was essential to have quick passage of the ordinance, or the proposed tenant would not sign the lease. On June 25th, the ordinance was passed unanimously and respondent was present and voted. Blonsley received for fees One Hundred Dollars on May 10, 1947, and a balance of Four Hundred Dollars on May 12, 1947. He testified that he issued a check to respondent for One Hundred Twenty-five Dollars, dated May 12, 1947, Complainant's Exhibit 120, and one to Becker and Savin for One Hundred Twenty-five dollars on the same date, Complainant's Exhibit 121, at respondent's request, as respondent's portion of the fee. Respondent denied that he had anything to do with the matter or that the checks represented a fee split. He could not testify what they were paid for except that they had nothing to do with the Piech transaction." Then followed the ruling that such charge was not sustained because of Blonsley's unreliability.

There is no dispute as to any of the foregoing facts pertaining to the Piech variation proceeding, except the two checks for $125 each. Respondent admits that he received and cashed these checks but that they did not relate to the Piech variation fees. It is significant to note that in each of the 14 cases respondent admitted receiving and cashing checks but denied that they were related in any way to

Blonsley's zoning activities. He feebly and vaguely explained that such checks must have been received by him as repayment for monies that he had previously loaned Blonsley.

It is my opinion that the commissioners were incredibly naive in believing such a story. It may very well be that Blonsley's disclosures are the product of hate and malice, but that does not render them necessarily untrue. In this record is found documentary support for Blonsley's testimony. Of considerable importance in this dispute is the testimony of Godown, an examiner of questioned documents who testified for the complainant. He examined all the checks given by Blonsley to respondent and examined them in connection with the book entries made by Blonsley reflecting the transaction. The expert said: "There are a number of reasons why I would not feel that there had been a fabrication here: Because the appearance and the arrangement, alignment, and the various intensities of the writing on these pages of the exhibits is in keeping with the normal carelessness with which day-to-day or periodic entries are made, and they lack the uniformity in these various features that are very frequently found in connection with manufactured documents and book entries. There are numerous factors that taken together lead me to the opinion that I have expressed here: that they are entries that were made on or about the dates in the normal course of business." I shall quote from the expert's testimony as it related to count II which has heretofore been mentioned. "I encountered a couple of instances, there, that I would interpret as being definitely in favor of the authenticity of the book entries in that in one instance there are two consecutive checks on the same date made payable both to an individual and to a law firm, a partnership, that together aggregate the same as two previously dated book entries of dissimilar amounts. I think the whole amount was $250 which was made up of a couple of book entries, and the

payment is made in two even payments of $125 each." Referring to an entry as to Joseph Piech, the witness stated: "There is an amount received on the 10th of $100 and on the 12th of $400, and a disbursement, apparently, on the 10th of $50 with a disbursement on the 12th of $200, and these are represented in the checks by two checks for $125, exhibits 120 and 121, issued on the 12th. * * * if one were to go back to fabricate these pages, that would be a rather elaborate procedure." So it can be observed that there is very convincing evidence that the two $125 checks were given respondent for the purposes outlined by Blonsley.

Count XXII, which is a declaratory judgment matter pertaining to the Lincoln Village Shopping Center, presents some interesting aspects. In behalf of Lincoln Village Shopping Center, Blonsley filed an application for a variation with the board of zoning appeals which was denied. Later he filed a suit for a declaratory judgment and a final decree was entered setting aside the zoning law as to the premises involved. The report of the board of managers recites: "Blonsley received a total fee of $2,000 for his services in this matter. He testified that this fee was divided as follows: $250.00 to Nathanson, who was then head of the Zoning Department of the Corporation Counsel's office, by a check for $250.00 payable to cash. Blonsley testified that on this check (complaint's Exhibit 221) there are the initials 'M.J.N.' identifying Nathanson. * * * Nathanson testified he never saw the check in his life. $800.00 to respondent, being one-half of the approximate remaining net fee of $1600.00. Respondent admitted receiving this fee. * * * $150.00 (the balance remaining after the $250.00 to Nathanson, $800.00 to respondent and $800.00 to Blonsley)" is accounted for, in the report, in this fashion: "filing fee $15; summons $3.50; certified copies $5; stenographer $15; court reporter $12.25; and court reporter $16," making a total of $66.75, which when

deducted from $150, the balance that has not been distributed, leaves $83.25. Blonsley testified that on December 21, 1948, he paid respondent the sum of $41.63 by check which is one-half of $83.25. Respondent admitted receiving this check but claimed, strange as it may seem, that it represented a repayment of a loan that he had made to Blonsley. Yet the board of managers—in the face of those detailed items of accounting, including a check in an odd amount—say that they believe Becker, when he testified that the check for $41.63 represented a repayment of a loan, without any explanation of why such a payment in such an unusual amount was made. Invariably the checks from Blonsley to Becker bore about the same dates as the checks from property owners to Blonsley in payment of processing their zoning problems. Becker testified that the loans were in small amounts—$10, $15, $25, or $50, but the checks in repayment were in much larger amounts and were at the time when Blonsley had been paid for legal services, and significantly represented exactly one half of the amount paid Blonsley.

Another area in which respondent was not completely frank is when he denies that Blonsley gave him any cash payments. The record contradicts this denial. Respondent admitted receiving a split of fees in the Mrs. Helen Jones matter. The fee was $150 and was paid Blonsley in June, 1949. After deducting a few small items of expense, Blonsley paid Becker $66 on or about June 20, 1949, but there are no checks to respondent in June, 1949—in fact there are none from April 15, 1949, until January 4, 1950. Therefore, if respondent received a split fee as he says he did in that case, he must have received it in cash. There are other instances when it appears that respondent did receive cash payment, but I will not prolong this opinion with the details.

I think it would be helpful for a complete understanding

of respondent's operations that I quote verbatim from the board of managers' report as to at least one of the counts sustained by them:

"Count XIX, Ward Baking Co. (A declaratory judgment matter)

"In this matter, Blonsley was not involved, but the respondent cooperated in a zoning matter with a lawyer named Maurice J. Nathanson, who once had been in the Corporation Counsel's office in Chicago in charge of zoning matters. James J. McClure, Jr., testified that he was associated with the law firm of Hopkins, Sutter, Owen, Mulroy and Wentz, who was then representing the Ward Baking Co.; that the company wished to use the premises at 2923 Montrose Avenue for a garage; that the Building Department had advised them that they required a variation from the commercial zoning designation, to a manufacturing purpose, and 'we found as a practical matter it was important to ascertain the alderman's position,' that the City Council would 'follow the wishes of the alderman in that area, if he wanted it they would approve, and if he did not, they would not approve.' McClure visited respondent on October 17, 1952, and at respondent's request a letter outlining the problem was sent to respondent who then sent a letter of transmittal to the Ravenswood Improvement Association. On November 24th, McClure and Thomas Mulroy, a member of the law firm representing Ward, met with respondent who stated that he 'personally could not approve such a variation'; that he might agree as a lawyer that the variation should be allowed but 'he had to live in the ward'.

"McClure further testified that respondent stated that he would indicate to the Corporation Counsel's office that he felt that there was no real problem and would not actively oppose it unless he heard from constituents; and that respondent stated that there was an alternative method, a

declaratory judgment suit to declare the zoning law unconstitutional or inapplicable to the property in question, and that Nathanson handled matters like that very expeditiously.

"Thereafter, McClure met with Nathanson on December 15, 1952, and Nathanson handled the case with McClure assisting in the matter. The declaratory judgment proceeding was first suggested by respondent and had not occurred to McClure until then. In respondent's Answer he. denied that he told McClure that as Alderman he would oppose an application for variation. However, in his testimony respondent admitted that he said that he 'would be of whatever help he could' if he did not have objections from the property owners and that he called Nathanson and advised him of the expected employment.

"On August 6, 1953, a decree in the declaratory judgment suit was entered in favor of the Ward Baking Company, and thereafter Nathanson received a fee of $3500.00 directly from the Ward Baking Company out of which he paid respondent $1300.00. Nathanson did not tell the Hopkins firm that he was sharing his fee with respondent.

"The complaint charges that respondent had never been employed by Ward as co-counsel and that he rendered no legal services in this matter. Respondent, however, testified that he had discussions with Nathanson, worked on the complaint and order, examined the property, worked on a written opinion that Nathanson prepared, and, after the entry of the order, called Corporation Counsel Mortimer or his assistant to inquire as to whether the City would take an appeal.

"The Commissioners are of the opinion that the undisputed facts of this Count established that respondent clearly violated Canons 6, 34 and 49 of the Canons of Ethics in that in his official capacity as alderman, though he stated he would oppose a zoning variation in his Ward, nevertheless respondent did not hesitate to recommend an attorney to carry forward a declaratory judgment action to

accomplish in effect the same result. Not only did respondent recommend the alternative declaratory judgment procedure, and the attorney to handle the matter, but after informing McClure he would oppose a variation, respondent, by his own admission actively participated in the declaratory judgment case and received a portion of the fee paid. It would appear from the record that the client, Ward Baking Co., was not informed of his activity in the case or his participation in the fee. In zoning matters respondent owed his first and primary duty to the public. It was in these matters that he was a public officer first and a private attorney second. It was improper for respondent to have or to give the appearance of having conflicting interests. Count XIX is therefore sustained."

To paraphrase respondent's involvement in that matter, it appears that Becker was unwilling to stultify himself by going before his council and recommending the variation, but was disposed to recommend another procedure namely, declaratory judgment, that his tribunal might be circumvented, and in addition recommended a lawyer that he knew to be an able seaman in that area, and admittedly received $1,300 for accomplishing an end that he knew was contrary to the interests of his constituents. Such conduct does not represent that undivided fidelity that Becker as alderman owed his constituents.

It is my opinion that Becker's conduct in splitting fees with Blonsley was indefensible. Becker's decision that he could not afford to admit, in these proceedings, the fee-splitting practice was a serious mistake. He was driven to defend his position by seeking refuge in such statements as "I relied upon Blonsley;" "he was the keeper of my conscience;" "he duped me;" and "he tricked me in these payments." In appraising the morality of respondent's conduct, it appears to me that his greatest sin lies in his failure to be completely candid in his testimony. It may very well be that Blonsley is no great bargain as a man or as a

lawyer. His betrayal of Becker invites considerable contempt, but withal, I am sure he told the truth about the fee splitting with respondent. The finding of the board of managers that 14 counts should be dismissed because they believed Becker and disbelieved Blonsley is bewildering. I am not in disagreement with the conclusion of the majority opinion, that respondent should simply be censured, for these proceedings have been a ruinous penalty—long and expensive—damaging his professional standing and· humiliating his fine family. As was indicated earlier, respondent was advancing rapidly in his legal and political pursuits. He was a splendid lawyer and a courageous fighter for good government in the Chicago city council. The exposure as herein revealed makes a sad chapter in his life. No doubt this case will serve as a warning to others.

Mr. JUSTICE HERSHEY joins in this concurring opinion.

Mr. JUSTICE KLINGBIEL, also concurring:

While I concur in the decision of the court, I cannot accept all that is said in the opinion. I agree with the conclusion that private representation should be avoided where the dispute is subject to determination or review by the body of which the lawyer is a member. Of course it is improper for a legislator, a. judge, an administrative official, or any other public officer to place himself in a position where a misuse of public functions is possible. (See *In re Harriss,* 364 Ill. 290.) But it is also improper for a lawyer, whether or not he is also a public officer, to undertake duties in which a misuse of professional functions is possible. In the usual form of conflicting representation the lawyer acts for two private interests in his professional capacity. But he may, with equal impropriety, represent the public on one side and a private interest on the other, in a matter in which they are adversely interested. A lawyer who is also a trustee or an executor cannot with propriety represent a claim against the trust or the estate to which he stands in a fiduciary relationship, even though the latter is

not a lawyer-client relationship. Precisely the same situation is presented when an alderman sues the city or a legislator sues the State as such, on behalf of private parties. The fact that he is not at the same time the city attorney or the Attorney General, as the case may be, is irrelevant if his relationship to the defending governmental unit is fiduciary in nature.

I would thus condemn conduct shown by those specifications wherein litigation was undertaken against the city to declare void its zoning ordinance. The fact that the court may be impartial is no answer to the charge. Such is the case in any suit prosecuted by a lawyer against another litigant whom he also represents. It is the conflicting loyalties, not the presence of power or influence, which is the determining factor in these situations. The fear that this conclusion would cause able members of the bar to avoid cases in certain fields of the law, if justified, is an argument for outlining with clarity the areas in which representation is ethically proscribed. It is no argument for condoning conduct which falls squarely within the meaning of existing rules of ethics.

I do not mean by the views I have expressed to say that a lawyer-alderman or lawyer-legislator should in all cases avoid a representation of private interests before administrative bodies, whose function, essentially, is to implement and complement legislation necessarily expressed in general terms. In such cases the city or the State, as such, is not sued as an adverse party. It has created the agency in question for the very purpose of affording a continuation, in some aspects, of the legislative process, although in an adversary setting. While even here the partiality involved in private representation affords temptation for a use of influence or a disregard of public interest, the realities of public employment may warrant an application of the canon which depends to some extent upon the circumstances of the particular case. The subject may not be entirely amen-

able to hard and fast rules, for as Mr. Justice Holmes has said with respect to another problem, the areas "shade into each other by imperceptible degrees." (*The Common Law,* p. 334.) Lawyers must be credited with some measure of judgment in areas of doubtful status, and if conduct is within the letter but outside the thought of ethical proscriptions it should not be subject to censure.

From what seems to me a realistic variation of the canons I would agree with the court that because variations during the period in question were subject to determination by the body of which respondent was a member, it was unprofessional of him to handle such matters for private applicants. On the other hand I cannot accede to the sweeping proposition that a legislator may, regardless of the nature of the dispute, appear professionally before administrative agencies of the governmental unit he represents as a legislator; and I think that under no circumstances is it proper for him to engage in litigation against his city or his State, as the case may be.

One other area of my disagreement deserves mention. The majority opinion places importance, apparently, upon "public disclosure" of participation. Whatever that may entail in the way of publicity, it hardly contributes to a rational solution of the present problem. If the conduct *per se* is not reprehensible I can see no logical purpose for requiring exposure, with possible misrepresentation to a public hardly in a position to pass upon matters of professional ethics. In any event I doubt the need for this court to add fuel to the machineries for public exposure which operate in every contested election; and as for enlightenment, the "bright light of public opinion" may well blind instead of provide illumination.

If, on the other hand, the conduct constitutes an "abuse of his privilege to practice" the penalty is disciplinary action by this court, not unwanted publicity. I cannot accept the implication that an attorney must appear "of record" in

these matters, either formally or by informal disclosure, before he can properly accept a fee or undertake a professional representation otherwise permissible. Compliance with standards of professional conduct, it seems to me, is a matter for professional and judicial determination, not for decision or sanction by public opinion.

For the reasons expressed I concur in the decision to censure.