(No. 68665.—

*In re* EDWARD ROBERT VRDOLYAK, Attorney, Respondent.

*Opinion filed May 30, 1990.—Modified on denial*
*of rehearing October 1, 1990.*

408

WARD, CLARK, and STAMOS, JJ., took no part.

James J. Grogan, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

William J. Harte, Ltd., of Chicago (William J. Harte and David J. Walker, of counsel), for respondent.

PER CURIAM: On March 17, 1987, the Administrator (Administrator) of the Attorney Registration and Disciplinary Commission (ARDC) filed a two-count complaint charging respondent, Edward Robert Vrdolyak, with various infractions of the Code of Professional Responsibility (Code) (107 Ill. 2d R. 1—101 *et seq.*). The two counts involve wholly unrelated activities. Count I pertains to respondent's representation of city employees in workers' compensation claims against the City of Chicago (City) while simultaneously serving as an alderman in the Chicago city council (council). Count II concerns the commingling and conversion of a client's funds and respondent's failure to enter into a written contingent fee agreement with that client.

On count I, the Hearing Board found that respondent's dual roles—alderman and attorney—created a conflict of interest which gave rise to an "inference of impropriety." The Hearing Board reasoned that the public could have been misled into believing that respondent, because of his position as an alderman, had a "competitive advantage" in representing city employees before the Industrial Commission. With respect to count II, the Hearing Board found that respondent had failed to properly handle the client's funds, but that failure was due to

an "honest mistake of fact." The Hearing Board found, however, that there was no justification for respondent's failure to execute a written contingent fee agreement with that client. The Hearing Board recommended that respondent be censured on the charges contained in count I and reprimanded for failing to have a written contingent fee contract under count II, and that the remaining charges in count II be dismissed.

Respondent filed exceptions to the Hearing Board's report with the Review Board. (107 Ill. 2d R. 753(e)(1).) The Review Board agreed with parts of the Hearing Board report, but rejected its recommendations and concluded that all of the charges against respondent should be dismissed. The Administrator petitioned this court for leave to file exceptions to the Review Board's report and recommendations (107 Ill. 2d R. 753(e)(6)).

The issues raised in this appeal are: (1) whether respondent engaged in unethical conduct by representing city employees in workers' compensation claims against the City while he was a city alderman; and (2) whether respondent should be sanctioned for the unintentional commingling and conversion of client funds and for failing to enter into a written contingent fee agreement with the client.

## FACTS

The stipulated facts reveal that respondent was admitted to the Illinois bar in May 1963. He started as a sole practitioner, but in 1966 or 1967 began hiring associates to assist him in his general practice, which included an emphasis in personal injury, workers' compensation and criminal cases. Around 1987, he incorporated his law business under the firm name of "Edward R. Vrdolyak, Ltd., P.C.," in which he was the sole shareholder. (See 107 Ill. 2d R. 721.) At the time of the ARDC complaint, the firm had three offices in Cook County and

12 associates. Since his admission to the bar, respondent had never before been the subject of any disciplinary proceedings.

The facts relating to count I are as follows. Respondent served as the elected Tenth Ward alderman in the council from February 1971 through April 1987, for which he was compensated with public funds. Respondent was a member of various council committees, including the committee on finance. The committee on finance had responsibility for municipal legislation involving the City's financial and budgetary affairs. Respondent was also a member of the committee on claims and liabilities, originally a subcommittee of the finance committee. The claims committee authorized the payment of money damages awards resulting from civil tort or contract claims against the City, but its jurisdiction did not extend to authorizing payment of workers' compensation benefits. Instead, a separate body, the bureau of workmen's compensation (Bureau), was responsible for recommending the payment of workers' compensation benefits to employees who were entitled to them under the Workers' Compensation Act. The Bureau's members were appointed by the chairman of the committee on finance, to whom the Bureau made its recommendations. According to the stipulated facts, however, respondent believed that workers' compensation claims required the approval of the council after a review by the committee on claims and liabilities. Relying on this belief, respondent sent letters to the corporation counsel, city clerk, and chairman of the committee on finance stating that he did not want to be recorded as voting on any workers' compensation or personal injury claims.

Funding for municipal operations, including council bureaus and committees, payment of claims and employee salaries, is appropriated from the City's budget. That budget is prepared by the City's executive branch

and adopted by the council, as the City's legislative branch.

Respondent, as an alderman, participated in the annual budget process—from hearings to voting on the adoption of the budget. As an alderman, he was also involved in approving mayoral appointments, including city department heads and commissioners of various independent and autonomous municipal corporations.

From January 1977 through January 1986, respondent or associates employed by his firm appeared as counsel of record in 35 workers' compensation cases against the City. These were matters pending before the Industrial Commission, a State agency. If a city employee filed a workers' compensation petition with the Industrial Commission, an assistant corporation counsel from the City's department of law would be assigned to file an appearance on behalf of the City. Each case would result either in a settlement or arbitration, and the majority of cases handled by respondent resulted in settlement. The proposed settlement or arbitration award was then submitted to the Industrial Commission for its approval.

The parties also agree that: respondent did not vote on personal injury or workers' compensation claims against the City; respondent was never the chairman of the committee on finance; and from 1977 through 1985, respondent or associates employed by his firm appeared as counsel of record in 44 workers' compensation cases filed against other independent municipal corporations—such as the Chicago Park District, Chicago Transit Authority and Chicago Board of Education.

The facts relating to count II are as follows. In April 1981, respondent's firm was retained by a private party to act as his attorney in an action against a former roommate. The firm was given $300 as a retainer. A suit was filed and, in August 1981, a $5,000 default judgment was entered in favor of the client. In June 1982,

another associate employed by the firm entered into an oral fee agreement with the client wherein the client agreed to pay the firm one-third of any money recovered on the judgment. No contingent fee agreement was executed. The associate obtained a wage-deduction order against the roommate's employer and, in December 1982, the employer sent respondent's firm a check in conformance with the wage-deduction order. That check was deposited into the firm's client trust fund account. During 1983, the employer sent other checks in varying amounts to the firm, some of which were deposited into the firm's operating account. Of the 10 checks sent by the employer, two were deposited into the firm's client trust fund account while eight were deposited into its general operating account. The firm's operating account was occasionally overdrawn during this time period.

Some time later, the client filed a complaint with the ARDC. When the respondent received the complaint he had his staff reconstruct the events. It was determined that the funds had been deposited into the firm's operating account because the firm's office manager, upon receiving the funds, contacted the secretary of the associate assigned the case and was told the funds were "for costs." The office manager then deposited the funds in the operating account, not the escrow account.

Respondent had delegated bookkeeping functions and clerical supervision to the office manager, a nonlawyer. This is the only known occurrence of client funds being deposited into the firm's operating account, and respondent has repeatedly instructed his staff to guard against such future errors. Moreover, respondent had no personal or independent knowledge of the misapplication of the client's funds or the lack of a written contingent fee agreement. Additionally, respondent immediately made full restitution to the client.

## COUNT I

Did respondent engage in unethical conduct by representing city employees in workers' compensation claims against the City while serving as an alderman?

The Administrator maintains that respondent violated Disciplinary Rule (DR) 1—102(a)(5) (engaging in conduct prejudicial to the administration of justice); DR 5—101(a) (accepting employment where the exercise of his professional judgment on behalf of a client may be affected by his own interests); DR 8—101(a)(1) (using his public position to obtain a special advantage in a legislative matter for a client); DR 8—101(a)(2) (using his public position to influence a tribunal to act in favor of his client); DR 8—101(a)(4) (representing a client in matters pending before the public body of which he is a member); and Canon 9 (failing to avoid even the appearance of impropriety) (107 Ill. 2d Rules 1—102(a)(5); 5—101(a); 8—101(a)(1), (a)(2), (a)(4); Canon 9). The Administrator argues that when an attorney accepts public office he assumes not only the rights and privileges but also the duties and burdens of office, including the obligation of representing the governmental unit with "undivided fidelity." As a result, a lawyer-legislator's actions should be free from temptation and suspicion when accepting employment where interests may conflict. Representation should be eschewed if the public would be led to conclude that the attorney was using his public position for personal gain. The Administrator also contends that, by representing city employees against the City, respondent divided his loyalties between client and governmental unit, and engaged in a conflict of interest. Even if his intentions and motives were honest, respondent's conduct was improper because workers' compensation claims are subject to review by the city council. The Administrator stresses the fact that the city council approved the budget which pro-

vided for the salaries of the assistant corporation counsels who opposed the respondent in the workers' compensation cases. Furthermore, the city council also approved the appointment of the corporation counsel. These factors are alleged to have created a situation, intended or not, which was ready for the exercise of undue influence and gave rise to the appearance of impropriety.

Respondent asserts that he did nothing unethical. He argues that the claims in which he appeared against the City were before the Industrial Commission, not the body of which he was a member. The Industrial Commission is a State agency and its decisions are reviewable in the courts, not the city council. Neither the council nor the Bureau has the ability or authority to "review" a determination of the Industrial Commission, and city employees who receive workers' compensation benefits are entitled to them as a matter of State statute, not municipal ordinance. Moreover, any action taken by either the council or the Bureau to process the payment of those claims is purely ministerial.

In addressing the issue, both parties have relied heavily upon *In re Becker* (1959), 16 Ill. 2d 488. There, respondent, a lawyer and Chicago alderman, was charged with, *inter alia*, representing conflicting interests and failing to represent the public with "undivided fidelity." He allegedly litigated three declaratory actions against the City, was co-counsel in an appeal from the City's zoning board of appeals to the courts, and also personally appeared on behalf of a client before the zoning board of appeals on a zoning matter. At the time, that board was authorized to hear applications for zoning variances and to make recommendations to the city council. The zoning board of appeals approved the variance. Afterwards, the respondent talked with the alderman of the ward where the property was located about the variance. The council unanimously passed the variance request. The respond-

ent also voted in favor of the proposal. He received a $350 fee for his services.

In ruling on the allegations of misconduct, this court found "nothing unethical in a [lawyer-legislator] appearing in litigation wherein his governmental unit is a party." (*Becker*, 16 Ill. 2d at 491.) It reasoned that a court would not be swayed by the "desires" of the legislative body or any of its members. Accordingly, there was nothing unethical about the respondent's appearance in the three declaratory actions against the City.

This court reached a similar conclusion with respect to a lawyer-legislator appearing before a subordinate board or tribunal created by the legislative body of which he is a member. (*Becker*, 16 Ill. 2d at 494.) It reasoned that any decision made by those entities would be subject to administrative review in the courts. This type of representation was subject to an important caveat: "[the lawyer-legislator] should not appear as counsel where the matter is subject to review by the legislative body of which he is a member"; to do so would raise conflicting interests between his duty to his client and his obligation to his governmental unit. *Becker*, 16 Ill. 2d at 494-95.

The respondent's appearance as co-counsel in the appeal from the zoning board of appeals to the court was deemed acceptable, because it fell "within the prohibitory exception." (*Becker*, 16 Ill. 2d at 496.) His representation of the client before the zoning board of appeals, however, created a conflict of interest which brought the legal profession into disrepute (*Becker*, 16 Ill. 2d at 496), and the respondent was censured for doing so.

A few observations are in order. Respondent was not a city employee; rather, he was a public official elected to serve in a legislative capacity, not a legal one. (See, *e.g.*, 63A Am. Jur. 2d *Public Officers & Employees* 666-84 (1984).) Consequently, this case is not one of "dual

representation." (*Cf. In re LaPinska* (1978), 72 Ill. 2d 461.) As an alderman, he could not represent the City in suits or other actions against it. (Ill. Rev. Stat. 1985, ch. 24, pars. 21—11, 21—14.) Nevertheless, it is beyond dispute that respondent owed his undivided loyalty and a fiduciary duty to the City. See, *e.g., Chicago Park District v. Kenroy, Inc.* (1980), 78 Ill. 2d 555, 562.

The Administrator takes exception to the Review Board's finding that "[r]espondent's conduct fell within a general rule which allows a lawyer-legislator to represent parties in certain litigation wherein the governmental unit is a party." He asserts, in light of the facts of this case, that conclusion was error. In the alternative, he argues that *Becker* has implicitly been overruled by the formal adoption of the Code, and under the Code respondent is *per se* prohibited from "representing clients in adversarial actions against the city." Respondent claims that his conduct falls "squarely within the holding of *Becker*."

To begin, the Administrator conceded in proceedings before the Hearing Board that the council does not review workers' compensation awards. Accordingly, respondent's conduct would be acceptable under the *Becker* standard. That, however, does not end the inquiry.

*Becker* was a pre-Code case, decided in 1959. At that time, this court had not adopted any comprehensive scheme for regulating attorney conduct. Relevant guidance was to be found in court opinions, and unofficially in the canons of ethics which had been promulgated by the various bar associations (*e.g.*, American (ABA), Illinois State (ISBA) and Chicago (CBA)). Those canons, however, were not binding obligations or enforceable in court as such, but they did provide a safe guide for attorneys confronted with an ethical dilemma; indeed, a lawyer could be disciplined for failing to follow them.

(See, *e.g.*, *In re Broverman* (1968), 40 Ill. 2d 302, 306; *Hunter v. Troup* (1924), 315 Ill. 293, 302.) Nevertheless, they were of interest to the court and helpful in reaching determinations in particular cases. *Illinois State Bar Association v. United Mine Workers* (1966), 35 Ill. 2d 112, 119, *vacated on other grounds* (1967), 389 U.S. 217, 19 L. Ed. 2d 426, 88 S. Ct. 353.

In response to changing conditions, the canons of ethics were displaced in 1970 when the bar associations adopted model codes of professional responsibility. (See, *e.g.*, Model Code of Professional Responsibility (ABA 1970); Illinois Code of Professional Responsibility (ISBA 1970); Code of Professional Ethics (CBA 1970).) These "new" models altered the landscape of legal ethics, as they differed in form and substance from the canons. (See generally R. Wise, Legal Ethics 3-16 (2d ed. 1970).) Yet, like their predecessors, they were merely advisory to the courts. This court, as always, remains the final authority in formulating, defining and enforcing standards governing the practice of law. See, *e.g.*, *In re D'Angelo* (1988), 126 Ill. 2d 45, 52; *In re Phelps* (1973), 55 Ill. 2d 319, 322; *In re Brotherhood of R.R. Trainmen* (1958), 13 Ill. 2d 391, 392.

In 1980, this court embarked on a new course when it formally adopted the Code. The Code established an organized scheme for regulating professional conduct. (*People ex rel. Brazen v. Finley* (1988), 119 Ill. 2d 485, 492-94.) The Code also enunciated mandatory, minimum rules to which attorneys are expected to conform. (*In re Cheronis* (1986), 114 Ill. 2d 527, 535 ("It is a paramount obligation of each member of the bar to study the [Code] and abide by its terms and principles"). See also 79 Ill. 2d R. 1—101 *et seq.*, Committee Commentary.) The standards articulated by the Code serve "as a beacon to [attorneys] in navigating an ethical course through the sometimes murky waters of professional conduct" (*Rear-*

*don v. Marlayne, Inc.* (1980), 83 N.J. 460, 469, 416 A.2d 852, 857), and ignorance of the Code is no excuse for attorney misconduct (*Cheronis,* 114 Ill. 2d at 535). Respondent, as a lawyer-legislator, is, nonetheless, "subject to the ethical standards of his profession, even though there is no attorney-client relationship involved in the public office." *Higgins v. Advisory Committee on Professional Ethics* (1977), 73 N.J. 123, 125, 373 A.2d 372, 373.

As an exercise of this court's inherent power over the bar and as rules of court, the Code operates with the force of law. Accordingly, the Code, as a binding body of disciplinary rules, has, *sub silentio,* overruled prior judicial decisions which conflict with its mandates and proscriptions.

With this as a background, we conclude that respondent engaged in a conflict of interest when he represented city employees in their workers' compensation cases against the City, while serving as an alderman. (107 Ill. 2d R. 5—101(a).) Respondent, as an alderman, owed his undivided fidelity and a fiduciary duty to the City. He also owed his undivided fidelity and a fiduciary duty to his clients. By representing clients against the City, the competing fiduciary duties collided, and respondent became embroiled in a conflict of "diverging interests" and divided loyalties, which even full disclosure could not avoid. *In re LaPinska* (1978), 72 Ill. 2d 461, 469-72.

In reaching this result, we find instructive several ethics opinions of the ISBA. (See *In re Samuels* (1989), 126 Ill. 2d 509, 524 ("the [ISBA] Code of Professional Responsibility constituted a safe guide for professional conduct").) After adopting its version of the Code in 1970, the ISBA found that it would be "professionally improper for a lawyer, who is a member of the County Board, to represent a party suing an agency of the

County." (ISBA Op. 544 (July 2, 1976). See also *Becker*, 16 Ill. 2d at 510-11 (Klingbiel, J., concurring); ISBA Op. 175 (February 6, 1959); ISBA Op. 298 (July 1, 1968); ISBA Revised Canon 49 (approved December 10, 1965) ("A lawyer who holds public office \*\*\* shall not represent clients before a body or office in any matter in which \*\*\* the [governmental unit] is an interested party").) Similarly, after the formal adoption of the Code by this court, the ISBA opined that "[i]t is not *per se* improper" for a lawyer-county board member to practice law, even to represent county employees, but such representation should be avoided where it would conflict with his duties as a legislator. (ISBA Op. 699 (April 20, 1981).) It was also determined that an attorney could serve on a county board if he did not appear before county officials or agencies who were "required to exercise discretionary functions." (ISBA Op. 737 (August 25, 1981).) Moreover, an attorney-county board member could be employed as a part-time special assistant Attorney General in condemnation cases, as long as the county was not a party to the proceedings. ISBA Op. 84—3 (October 29, 1984). See also ISBA Op. 84—11 (January 25, 1985) (citing to instances where a lawyer-public official would be involved in an "actual conflict" when representing private clients and thus precluded from undertaking such representation).

As a practical matter, a lawyer-legislator should anticipate possible conflicts of interest when accepting employment and guard against them. (See, *e.g.*, Eisenberg, *Conflicts of Interest Situations and Remedies*, 13 Rutgers L. Rev. 666 (1959).) Here, respondent argues that "the rule relative to conflicts of interest in 1957 for aldermen-legislators [*sic*] was the same as it is today." This is an inaccurate depiction of the Code. Among other reasons, DR 5—105(a) adopted a new test to determine whether a conflict exists: the "independent professional judgment" test. (79

Ill. 2d R. 5—105(a). See also O. Maru, Annotated Code of Professional Responsibility 225-41 (ABA Foundation 1979).) By not taking that "test" respondent failed to uncover the ethical problems confronting those in public office. (See, *e.g.*, Braverman, *Ethics Problems for Those Going In or Out of Some Public Offices*, 71 Ill. B.J. 98 (1982) (describing ISBA opinions pertaining to professional ethics and public officials).) Instead, respondent, at his peril, chose to ignore the Code and operate under a false premise. Respondent occupied a position of public trust. He violated that trust by representing clients against the City, to whom he also owed his undivided loyalty. The public trust cannot be compromised in this or any other fashion: if a lawyer-legislator undertakes the private representation of a client against his governmental unit either the client or the public must necessarily suffer; neither should. Rather, attorneys should act to instill public confidence in the integrity of the legal profession and our governmental institutions. "Public exposure of attorneys holding public positions accentuates this need. The public has become alert and sensitive to the impropriety of conflicts of interests." *In re Opinion No. 415* (1979), 81 N.J. 318, 324, 407 A.2d 1197, 1200.

Therefore, we hold that a lawyer-legislator may engage in the private practice of law including representing governmental employees, unless the governmental unit of which he is a member is an adverse party—regardless of the forum. (See, *e.g.*, *Gomez v. Superior Court* (1986), 149 Ariz. 223, 226, 717 P.2d 902, 905 (where officeholder removes himself and his firm from cases against the city "the danger of actual conflict appears minimal"); *Georgia State Board of Pharmacy v. Lovvorn* (1985), 255 Ga. 259, 336 S.E.2d 238 (Georgia constitution prevents lawyer-legislator from appearing before a State body on behalf of a fee-paying client); *Georgia Department of Human Resources v. Sistrunk* (1982), 249 Ga. 543, 291 S.E.2d 524;

Or. Const., art. XV, §7 (prohibiting lawyer-legislator from prosecuting any claim against the State); N.J. Stat. Ann. §52:13D—16 (West 1986) (prohibiting appearance of lawyer-legislator before State agencies); *In re Ethics Opinion No. 74—28* (1975), 111 Ariz. 519, 533 P.2d 1154; Note, *Legislators as Private Attorneys*, 30 UCLA L. Rev. 1052, 1075 n.128 (1983).) If another governmental unit is an adverse party, the lawyer-legislator must carefully examine the circumstances to determine whether a conflict of interests exists; if so, he should decline employment in that case.

It has been said that when dealing with ethical principles one should not "paint with broad strokes." (See *Board of Education of the City of New York v. Nyquist* (2d Cir. 1979), 590 F.2d 1241, 1246.) Yet, "[i]f we are to maintain public confidence in our system of government and the legal profession, attorneys who serve as public officials must avoid not only direct conflicts of interests, but also any situation which might appear to involve a conflict of interest." (*Higgins v. Advisory Committee on Professional Ethics*, 73 N.J. at 125, 373 A.2d at 373, citing ABA Comm. on Professional Ethics and Grievances, Formal Op. 49 (1931).) That reasoning remains compelling.

Regarding the other alleged Code violations, we find that DR 1—102(a)(5) was not violated. Although respondent's presence in the workers' compensation cases against the City might have had a "chilling effect" on opposing counsel's exercise of discretion as to whether or not to settle a case, a bare assertion of prejudice is insufficient to sustain the charge. There must be clear and convincing evidence that the administration of justice was, indeed, prejudiced. Here, that quantum of proof is lacking.

After reviewing the record and in light of the Administrator's admission in arguments before the Hearing Board, we find that Disciplinary Rules 8—101(a)(1), (a)(2), and (a)(4) were not violated. The workers' compensation

cases did not involve legislative matters; there is no evidence that respondent attempted to influence the Industrial Commission, nor does the Administrator argue that an assistant corporation counsel is a "tribunal"; and respondent did not represent a client in a "proposal" pending before the council.

Respondent was also initially charged with violating Canon 9 (107 Ill. 2d Canon 9), but he was not charged with a substantive violation of one of the disciplinary rules under that Canon. Consequently, there could be no violation of Canon 9. *In re Powell* (1988), 126 Ill. 2d 15, 29-30.

As we have held that respondent engaged in a conflict of interest, we must determine the appropriate sanction. Although we strive for consistency in the sanctions ultimately imposed, we recognize that each case of attorney misconduct is unique and requires an independent evaluation of its relevant circumstances. (*In re Cheronis* (1986), 114 Ill. 2d 527, 535.) In determining the appropriate sanction, we will consider the relevant factors in aggravation and mitigation. *In re Weinstein* (1989), 131 Ill. 2d 261, 270-71.

In aggravation, the Administrator emphasizes that respondent's activities constituted a serious breach of the fiduciary duties he owed to both the citizens of Chicago and his clients.

In mitigation, we recognize that respondent has an unblemished record as attorney since 1963 and has been active in community and social organizations since that time. Respondent also has performed *pro bono* services throughout his professional career.

More significantly, although his conduct was violative of the Code, respondent acted in good faith by adhering to the dictates of *Becker*. As evidence of his good faith, respondent refrained from voting on workers' compensation or personal injury claims as an alderman.

Having considered these factors, we deem censure to be the appropriate sanction.

## COUNT II

The next issue presented for review is whether respondent is subject to discipline for commingling and converting a client's funds and for failing to enter into a written contingent fee agreement with that client.

The Administrator asserts that, "as a matter of law," respondent's unintentional commingling and conversion of the client's funds constitutes misconduct and warrants discipline. The Administrator further asserts that respondent failed to enter into a written contingent fee agreement with that client in violation of DR 2—106(c) (107 Ill. 2d R. 2—106(c)). The Administrator contends that respondent should not be shielded from discipline simply because he delegated work to others in his firm. Respondent admits that his firm unintentionally commingled and converted the client's funds. However, respondent emphasizes that he had no personal knowledge of the office manager's error. In addition, respondent stresses that his firm made full and immediate restitution to the client once the error was brought to his attention and that he took steps to ensure that this type of error would not reoccur in the future. Respondent also argues that he should not be vicariously subject to discipline for his associate's failure to enter into a written contingent fee agreement.

It is well settled that an attorney must not commingle or convert a client's funds. (*In re Kitsos* (1989), 127 Ill. 2d 1, 10.) In fact, a single act of commingling and conversion may justify disbarment. (*In re Pass* (1985), 105 Ill. 2d 366, 370.) Even if the act was unintentional or technical, an attorney who commingles or converts a client's funds is subject to discipline. (*In re Ushijima* (1987), 119 Ill. 2d 51, 57-59.) The motive or intent of the

attorney is not relevant in determining whether the attorney violated the Code of Professional Responsibility, but may properly be considered as a mitigating factor in determining the degree of discipline. *In re Clayter* (1980), 78 Ill. 2d 276, 283.

In the case at bar, the office manager of respondent's firm deposited the funds in the firm's operating account *after she was told by the secretary of the associate assigned to the case* that the funds were "for costs." While there is authority for the proposition that an attorney, who is the sole shareholder of a professional partnership, is personally responsible for the acts of a nonprofessional in the administration of the corporation (see, *e.g.*, 107 Ill. 2d R. 5—107(d), Committee Commentary), respondent's connection to the office manager's error was, at most, tenuous.

The associate, not respondent, was fully responsible for the handling of the case. The associate's secretary, not respondent's secretary, misinformed the office manager that the funds were "for costs." In fact, the Administrator agrees that respondent had no knowledge that the funds were placed in the firm's operating account. Furthermore, as respondent was not at all involved in the handling of the case, it does not appear that respondent could have learned of the misplaced funds. Moreover, as the amount of the misplaced funds totalled only $594.82, it was reasonable for the office manager to accept the secretary's statement that the fund's were "for costs." Finally, the fact that respondent made full restitution to the client once the error was brought to his attention provides further support that respondent did not have knowledge of the misplaced funds and that he dealt with the client in good faith.

An attorney cannot avoid his professional obligations to a client by the simple device of delegating work to others. (*In re Weinberg* (1988), 119 Ill. 2d 309.) However,

an attorney who delegates work to others can only be subject to discipline for conduct he authorized, had knowledge of, or had reason to know. (*In re Weston* (1982), 92 Ill. 2d 431, 437; *In re Ashbach* (1958), 13 Ill. 2d 411, 415.) Here, it is agreed upon by all parties that respondent did not possess any knowledge of the misplaced funds. While the mismanagement of client funds remains a serious violation of the Code of Professional Responsibility (*In re Holz* (1988), 125 Ill. 2d 546, 555-59), respondent, under the facts of this case, is not guilty of professional misconduct.

Likewise, respondent is not guilty of professional misconduct for his associate's failure to enter into a written contingent fee agreement with the client. Although DR 2—106(c) admits to no exception to the rule that contingent fee agreements be in writing (see *Warner v. Basten* (1969), 118 Ill. App. 2d 419, 431), respondent, under the facts of this case, cannot be vicariously subject to discipline for his associate's conduct. Respondent neither knew nor had reason to know of his associate's failure to enter into a written agreement. Furthermore, it is impractical and unreasonable to expect respondent to review the associate's files to ensure that he entered into a written contingent fee agreement when there was no reason for respondent to know that the associate would fail to do so.

For the foregoing reasons, the charges contained in count II are dismissed, and the respondent is censured on count I.

*Respondent censured.*

JUSTICES WARD, CLARK, and STAMOS took no part in the consideration or decision of this case.