**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Lawrence S. BLOOM, Defendant–Appellee.**

No. 98–1361.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1998.

Decided July 13, 1998.

Rehearing is Denied Aug. 13, 1998.

Dean J. Palales, Barry Rand Elden, Chief of Appeals (argued), Office of the United States Attorney, Criminal Division, Chicago, IL, for Plaintiff–Appellant.

Daniel E. Reidy (argued), Jones, Day, Reavis & Pogue, Chicago, IL, for Defendant–Appellee.

Before BAUER, EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

An indictment charges Lawrence Bloom—between 1979 and 1995 the Alderman for Chicago's Fifth Ward—with corruption in office. The question presented by the prosecutor's interlocutory appeal under 18 U.S.C. § 3731 is whether a portion of Count I, which accuses Bloom of mail fraud, charges a public-capacity or only a private-capacity offense. The district court dismissed Count I to the extent it alleges that Bloom schemed to deprive Chicago of the intangible right to his honest services, holding that the charge properly claims only that Bloom schemed to deprive the City of tax revenues.

Aldermanic positions in Chicago are part-time jobs. In his private life, Bloom is a lawyer. Count I charges that Bloom counseled one of his clients to use a proxy bidder at a tax scavenger sale. (We recount the allegations, whose truth remains to be determined.) Komed Health Center, the client,

owned real property on which it owed more than $283,000 in real estate taxes. Property taxes, although levied by Cook County, flow through to the City's coffers. Counties in Illinois sell properties with tax delinquencies at auction; the high bidder receives a certificate, which becomes a tax deed if the owner does not redeem the property by paying all back taxes plus interest. 35 ILCS 200/21–260. Another section of the statute requires each bidder to certify that "the person has not bid upon or applied to purchase any property at the sale for a person who is the party or agent of the party who owns the property or is responsible for the payment of the delinquent taxes". 35 ILCS 200/21–265(a)(1). Illinois permits the winning bidder at a tax scavenger sale to sell his rights to the original owner, even though that wipes out the owner's incentive to redeem by paying delinquent taxes to the county. The state apparently believes, however, that these transactions would occur too frequently if bidders were agents or nominees of the owners. Bloom advised Komed that it could avoid paying taxes, yet retain control of the property, by sending to the auction a person who had agreed to sell the certificate or tax deed to Komed. Bloom told Komed that the maneuver was illegal but added that people did it all the time. Komed's agent later made the winning bid and, after the redemption period expired, conveyed the property back to Komed, which thus avoided most of its taxes. (The County recovered only the amount bid at the auction; Komed paid this, plus a premium to its agent, and saved the balance of the tax bill.) ·

The prosecutor has identified two theories under which the scheme was mail fraud (use of the mails being integral to tax scavenger sales) in violation of 18 U.S.C. § 1341: first, the arrangement finagled the City and County out of revenues they might have received had they known the truth about the proxy's allegiance and disqualified him from participating in the auction; second, the arrangement deprived the City of Bloom's honest services. According to the prosecutor, Bloom was a fiduciary who owed the City a duty of loyalty and therefore was required, when practicing law, to refrain from participating in or giving advice about any transac-

tion that could reduce the City's revenues. *In re Vrdolyak*, 137 Ill.2d 407, 148 Ill.Dec. 243, 560 N.E.2d 840 (1990), holds that another lawyer-alderman violated his ethical duties when he represented persons who had legal claims against the City, because any increase in his clients' recoveries necessarily would reduce the City's assets. Although vigorous representation of the same clients by a lawyer without ties to the City could have produced the same or greater outlays, the Supreme Court of Illinois thought that it conveys the wrong appearance for a fiduciary of the City to be the advocate of the City's adversary, especially in light of the possibility that the lawyer representing the City will find it prudent to accommodate an alderman who sits on the opposite side of the table. Similar reasoning, according to the prosecutor, shows that lawyer-alderman Bloom violated his duty to give Chicago his undivided loyalty. Of course *Vrdolyak* was about ethics rather than fraud, and few violations of ethical duties are federal crimes. What the prosecutor needs is a way to equate unethical conduct with a "scheme or artifice to defraud", the key language of § 1341. Although *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), scotched the "intangible rights" doctrine that treats some violations of fiduciary duty as fraud, Congress enacted in 1988 a statute providing: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. The Komed scavenger sale occurred in 1991, so Bloom's acts are covered by § 1346. But the district judge dismissed Count I, to the extent it rests on the intangible rights doctrine, because he thought that the *Vrdolyak* ruling deemed unethical only participation in litigation against the City and did not condemn all activities (such as tax-planning advice) that might indirectly affect the City's revenues.

## I

■ Our first question is whether the prosecutor is entitled to interlocutory review of this order. Section 3731, the Criminal Appeals Act, authorizes appeal from an order

"dismissing an indictment or information ... as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution." The district court did not dismiss Count I; it just excised the intangible rights theory. Relying on the text of § 3731, Bloom argues that we lack jurisdiction. If the text of the statute were the last word, we would be inclined to agree. See *United States v. Spilotro*, 884 F.2d 1003, 1005 (7th Cir.1989); *United States v. Horak*, 833 F.2d 1235 (7th Cir.1987). But it is not. In *United States v. Wilson*, 420 U.S. 332, 337, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), and *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 568, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977), the Court wrote that § 3731 is "intended to remove all statutory barriers" to appeals from orders terminating prosecutions. Neither of these cases involved an appeal from an order paring down a single count, but *Sanabria v. United States*, 437 U.S. 54, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978), did, and stated:

> We agree with the Court of Appeals ... that there is no statutory barrier to an appeal from an order dismissing only a portion of a count. One express purpose of 18 U.S.C. § 3731 (1976 ed.) is to permit appeals from orders dismissing indictments "as to any one or more counts." A "count" is the usual organizational subunit of an indictment, and it would therefore appear that Congress intended to authorize appeals from any order dismissing an indictment in whole or in part. Congress could hardly have meant appealability to depend on the initial decision of a prosecutor to charge in one count what could also have been charged in two, a decision frequently fortuitous for purposes of the interests served by § 3731. To so rule would import an empty formalism into a statute expressly designed to eliminate "[technical] distinctions in pleadings as limitations on appeals by the United States." H.R. Conf. Rep. No. 91–1768, p. 21 (1970); accord, S.Rep. No. 91–1296, p. 5 (1970). We note that the only Court of Appeals other than the court below that has considered this question reached a similar result. *United*

*States v. Alberti*, 568 F.2d 617 (C.A.2 1977).

437 U.S. at 69 n. 23, 98 S.Ct. 2170. Bloom asks us to dismiss this passage as dictum and to hold that only an order dismissing an entire count may be appealed. *United States v. Louisiana Pacific Corp.*, 106 F.3d 345 (10th Cir.1997), supports Bloom's position, but we are unpersuaded. Other courts of appeals likewise believe that the footnote in *Sanabria* is authoritative. *United States v. Levasseur*, 846 F.2d 786, 790 (1st Cir.1988); *United States v. Tom*, 787 F.2d 65, 70, 71 (2d Cir.1986); *United States v. Hill*, 55 F.3d 1197, 1199 (6th Cir.1995); *United States v. Martin*, 733 F.2d 1309 (8th Cir.1984); *United States v. Marubeni America Corp.*, 611 F.2d 763, 764–65 (9th Cir.1980); *United States v. Oakar*, 111 F.3d 146, 149–50 (D.C.Cir.1997).

*Louisiana Pacific* starts from the premise that "there is a presumption against the availability to the government of an interlocutory appeal in a criminal case." 106 F.3d at 348. That was so before the Criminal Appeals Act was amended in 1970, but not since. Paragraph 5 of § 3731 tells courts to construe the rest of § 3731 liberally. *Wilson* and *Martin Linen* say that ¶ 5 reverses the old presumption and that today the prosecutor may appeal from terminating orders (and some other orders that jeopardize prosecutions, such as orders suppressing evidence) whenever the double jeopardy clause permits. Limitations now depend on § 3731, not on an outdated judicial hostility to prosecutorial appeals.

Is a theory of criminal liability a "count" for purposes of § 3731? *Sanabria* answers "yes". Justice Stevens filed separate opinions in *Martin Linen* and *Sanabria*, contending that § 3731 should be read with an eye to curtailing interlocutory appeals, which meant to him that "count" should be understood to mean "all of a count" rather than "a theory of criminal liability in a count." In *Louisiana Pacific* the tenth circuit wrote that "Justice Stevens points out the flaw in the Court's dicta regarding" appeals under § 3731. 106 F.3d at 349. But no matter what we may think about the strength of the competing arguments, in both *Martin Linen* and *Sanabria* Justice Stevens was a minority

of one. An inferior court is not entitled to say that because the one is more persuasive than the eight, it will follow the one. Even if the passage could be called dictum, it is a not an aside unrelated to the subject of the case. The question had been briefed by the parties, so the statement was informed rather than casual; it is a considered expression by the Court supported by earlier cases (such as *Wilson*) that supply more extensive analysis and is not incompatible with any decision before or since. Contrast *Zenith Radio Corp. v. United States*, 437 U.S. 443, 460–62, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978). It would ill serve the interests of litigants and the judicial system as a whole to row against the tide of such statements. See *Reich v. Continental Casualty Co.*, 33 F.3d 754, 757 (7th Cir.1994); *United States v. Underwood*, 717 F.2d 482, 484–86 (9th Cir.1983) (en banc). The Supreme Court often articulates positions through language that an unsympathetic audience might dismiss as dictum—consider the catalog of rules in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)—and it expects these formulations to be followed. See *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976) (disapproving, with some asperity, a court's decision to alter one of the guidelines announced, arguably in dictum, in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The Court can hear only a small portion of all litigated disputes; it uses considered dicta to influence others for which there is no room on the docket. Appellate courts that dismiss these expressions and strike off on their own increase the disparity among tribunals (for other judges are likely to follow the Supreme Court's marching orders) and frustrate the evenhanded administration of justice by giving the litigants an outcome other than the one the Supreme Court would be likely to reach were the case heard there.

As it happens, however, *Sanabria*'s treatment of § 3731 was not dictum. It was no stray remark or aside. It explains the Court's rationale and thus is part of the holding. See *United States v. Crawley*, 837 F.2d 291 (7th Cir.1988). The district court dismissed one theory of liability in an indictment; the prosecutor appealed; both the court of appeals and the Supreme Court concluded that § 3731 authorizes such an appeal if further prosecution would not be barred by the double jeopardy clause. Disagreeing with the court of appeals, the Supreme Court held that the double jeopardy clause *did* bar retrial. It was this additional conclusion that led the tenth circuit to call its treatment of § 3731 dictum. But the Court reached the double jeopardy question only because its reading of § 3731 made it dispositive. Had the majority agreed with Justice Stevens about the meaning of § 3731, it would have done as he urged: it would have ordered the appeal dismissed without turning to the Constitution. Longstanding practice calls for federal judges to explore all non-constitutional grounds of decision before addressing constitutional ones—and especially to decide first whether any statute confers jurisdiction. See *Wilson*, 420 U.S. at 336, 95 S.Ct. 1013. See also *Steel Co. v. Citizens for a Better Environment*, — U.S. —, — ——, 118 S.Ct. 1003, 1012–16, 140 L.Ed.2d 210 (1998). That is what the Court did in *Sanabria*. It would make little sense to treat this wise effort to avoid constitutional issues as an affront to Article III of the Constitution—that is, as producing only advisory opinions on the statutory issues—the way the tenth circuit did in *Louisiana Pacific*.

Bloom has a fallback argument on jurisdiction. Several appellate decisions that entertained appeals from orders dismissing parts of counts did so only after concluding that the dismissed portion "provides a discrete basis for the imposition of criminal liability." *Oakar*, 111 F.3d at 149–50 (citing other cases). Although the *Sanabria* footnote concludes that "Congress intended to authorize appeals from *any* order dismissing an indictment in whole *or in part*." 437 U.S. at 69 n. 23, 98 S.Ct. 2170 (emphasis added), these courts believe that the "discrete basis" approach is a useful way to limit attention to important disputes. We need not decide whether to embrace the "discrete basis" approach because it is satisfied when (as in *Sanabria* itself) the judge removes a theory of liability—as opposed to, say, a single overt

act from a conspiracy charge, or a particular predicate act in a RICO case.

Unless the district judge perceived that the portion of Count I he dismissed "provides a discrete basis for the imposition of criminal liability", he either would have dismissed the entire count or would not have dismissed any of it. It is *only* because the language to which Bloom objects "provides a discrete basis for the imposition of criminal liability" that it made sense to dismiss part of Count I. It would be unwise to allow Bloom—who persuaded the district judge that one part of the charge is legally distinct enough from another—to argue now that the part dismissed and the part retained are so similar that the appeal should be dismissed. That would make a virtue of inconsistency. To the extent *United States v. Margiotta*, 662 F.2d 131, 139–41 (2d Cir.1981), let a defendant succeed with such a Janus-faced argument, we do not follow it.

## II

The district judge concluded that *Vrdolyak* does not deem unethical every instance in which a lawyer-alderman gives a client advice that could harm the City's financial interests. Reading *Vrdolyak* the way the prosecutor does would foreclose even legitimate legal advice, the judge thought, such as informing a client that it is possible to protest through administrative channels the County's increase in assessed property-tax valuation. All *Vrdolyak* requires, the court concluded, is that the lawyer-alderman avoid representing a client in litigation against the City. The United States seeks to persuade us that *Vrdolyak* establishes the much broader rule that aldermen and other public employees may not do anything in their private lives that acts against the City's interests—but if its rule were *that* broad, then every city employee would be required to shop exclusively in Chicago in order to maximize its receipts from sales taxes, and would be guilty of a federal felony if he bought a pair of boots through the mail from L.L. Bean. Even if the employee paid the countervailing use tax that applies when a local sales tax has not been collected (compare 35 ILCS 105/4 with 35 ILCS 105/3–55(d)), the crime would have been committed, for Illinois collects only its own tax, not the supplemental sales tax that the City imposes on local purchases. Doubtless there is a limiting principle and some conflicts of interest are tolerable; a member of General Motors' board of directors is (legally) entitled to drive a Ford; but it is frightening to contemplate the prospect that the federal mail fraud statute makes it a crime punishable by five years' imprisonment to misunderstand how a state court in future years will delineate the extent of impermissible conflicts. Then we would have a federal common-law crime, a beastie that many decisions say cannot exist. E.g., *United States v. Bass*, 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 3 L.Ed. 259 (1812); *United States v. Reynolds*, 919 F.2d 435, 438 (7th Cir.1990). See also *McNally*, 483 U.S. at 360, 107 S.Ct. 2875. Courts have applied this no-common-law-crimes principle to mail fraud prosecutions by holding that violations of state-law fiduciary duties do not turn into mail fraud just because the mails are used in the process. "Not every breach of every fiduciary duty works a criminal fraud." *United States v. George*, 477 F.2d 508, 512 (7th Cir.1973). See also *United States v. Walters*, 997 F.2d 1219 (7th Cir.1993), which rejects the idea that all deceits are criminal fraud. But if "not every breach" is criminal fraud, where is the line drawn? Its location cannot be found by parsing § 1341 or § 1346, a profound difficulty in a criminal prosecution.

One way to cope with this problem would be to limit prosecutions to cases in which a defendant's acts not only violated a fiduciary duty but also transgressed some other rule of law. Over and over the prosecutor's brief emphasizes that Bloom advised Komed to violate 35 ILCS 200/21–265(a)(1). As a limiting principle, this has two shortcomings. First, Bloom did not violate 35 ILCS 200/21–265(a)(1); only Komed and the straw purchaser did so. Second, and more important, this line of argument has nothing to do with Bloom's status as an alderman. If advising a client to violate a state law in order to avoid paying taxes is a scheme to defraud the governmental body that should have received those taxes (and we express no opinion on

the subject), then every member of the bar would be as culpable as Bloom. What the intangible rights theory adds is the possibility that a public employee commits a crime even when state law *allows* the client to do what the lawyer recommends. Then the fiduciary status makes a difference, for in an intangible rights case what the employer loses is the employee's loyalty, not (necessarily) money or other property. Again consider *Vrdolyak.* No one thought that Alderman Vrdolyak had violated (or counseled the violation of) any state law by representing persons who had filed workers' compensation claims against the City. It was the conflict of interest, and not any other impropriety, that the Supreme Court of Illinois thought objectionable. On the prosecution's approach, any lawyer-alderman who pursues a workers' compensation case against the City tomorrow commits a felony, even if the City wins and never pays a penny in compensation (or pays no more than what it would have paid had some other lawyer represented the claimant).

An intangible rights indictment based as this one is on *Vrdolyak* necessarily asserts that every conflict of interest is a federal crime. Suppose, for example, that Bloom had described the tax scavenger sale system to Komed, told it *not* to send a straw bidder, and added that after the auction Komed lawfully could approach the winning buyer with a proposal to repurchase the property. Or suppose Bloom had told Komed that taxes are lower in the suburbs and advised it to relocate. Under the prosecutor's theory, this advice is a federal felony—for, if acted on, the advice could reduce the City's tax income, and by giving the advice the lawyer-alderman therefore deprived the City of its right to his complete loyalty, a deprivation that occurs even if the advice is not taken. Approving that position would extend the intangible rights definition of "fraud" beyond sensible bounds, creating a common-law crime in the process.

In *McNally* the Supreme Court described the intangible rights theory this way: "a public official owes a fiduciary duty to the public, and misuse of his office for private gain is a fraud." 483 U.S. at 355, 107 S.Ct. 2875. This is the theory that *McNally* disap-proved as unsupported by § 1341, and that by enacting § 1346 Congress reinstated. We do not think that § 1346, with its unelaborated reference to "a scheme or artifice to deprive another of the intangible right of honest services", creates criminal liability for events that would not have been crimes before *McNally.* But if *McNally*'s description of the intangible rights doctrine is accurate, then it is clear that Count I does not charge Bloom with an intangible rights fraud. For it does not charge that he misused his office for private gain. It does not charge that he *used* his office in any way, let alone that he *mis*used it.

Misuse of office (more broadly, misuse of position) for private gain is the line that separates run of the mill violations of state-law fiduciary duty—such as Alderman Vrdolyak's representation of a client against the City—from federal crime. It is how we can give substance to the statement in *George* that "[n]ot every breach of every fiduciary duty works a criminal fraud." In almost all of the intangible rights cases this circuit has decided (before *McNally* or since § 1346), the defendant used his office for private gain, as by accepting a bribe in exchange for official action. E.g., *United States v. Holzer,* 816 F.2d 304 (7th Cir.), vacated in light of *McNally,* 484 U.S. 807, 108 S.Ct. 53, 98 L.Ed.2d 18 (1987); *United States v. Isaacs,* 493 F.2d 1124, 1149–51 (7th Cir.1974). The prosecutor relies principally on *United States v. Keane,* 522 F.2d 534 (7th Cir.1975), which sustained the conviction of an alderman who plotted to divert to favored buyers property offered at tax scavenger sales, and *United States v. Bush,* 522 F.2d 641 (7th Cir.1975), which affirmed the conviction of a public employee (the Mayor's press secretary) who was a silent partner in a firm that obtained a public contract. In neither of these cases, the prosecutor asserts, did the defendant take any action in his public capacity. But the indictments in both *Bush* and *Keane* alleged that the defendants converted to private use information that they possessed by virtue of their public positions.

Secret conversion of information received in a fiduciary capacity is a form of fraud against the owner of that information.

See *United States v. O'Hagan*, —— U.S. ——, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997). The Court held in *O'Hagan* that a lawyer who by virtue of his position in the law firm knew about a client's impending tender offer defrauded the client by using the confidential information to buy stock for his own account. Bush and Keane were doing much the same thing with confidential information they obtained in their public positions, though they used it in tax sales rather than stock transactions. The Court did not say or imply in *O'Hagan* that it would have been a criminal fraud had the lawyer given a second client legal advice that might have undermined the first client's business interests. Giving such advice might violate principles of legal ethics, but it would not *defraud* anyone. Yet this hypothetical is pretty much what the indictment charges Bloom with doing. Nothing in Count I of the indictment alleges that Bloom held any confidential information in his capacity as the City's fiduciary, or that he used to Komed's benefit any information that he received because he was an alderman. It does not allege that Bloom learned about the possibility of straw bidders because of his status as an alderman or that his public position facilitated his advice to Komed in any way. Only by abandoning the principle of *George* that there is a difference between fraud and a simple breach of fiduciary duties could we conclude that Count I states an intangible rights fraud.

No case we can find in the long history of intangible rights prosecutions holds that a breach of fiduciary duty, without misuse of one's position for private gain, is an intangible rights fraud. The prosecutor argues, however, that *United States v. Bronston*, 658 F.2d 920 (2d Cir.1981), fills the bill. Bronston, a partner of a law firm (and, like Bloom, a politician in his spare time, as a member of the New York State Senate), occasionally represented Convenience and Safety Corporation, an aspirant to a large project that New York City planned to fund. Bronston proposed that the firm represent C&S in this endeavor, but the firm had earlier agreed to represent BusTop Shelters, a rival to C&S. The partner in charge of resolving conflicts told Bronston that the firm (and thus Bronston) could represent only BusTop. Bronston nonetheless did legal and lobbying work on behalf of C&S, attempting to influence New York's decision with correspondence on his Senate letterhead, and was convicted of defrauding the law firm (and BusTop) of his honest services. Bronston misused both of his positions: he sent a letter on Senate stationery, and he converted to the benefit of C&S information received at the law firm, a step that meets *O'Hagan*'s definition of fraud. See 658 F.2d at 924. Thus *Bronston*'s holding does not support the prosecutor's position. Still, some of its language does so. The second circuit wrote that Bronston's failure to tell BusTop and the law firm what he was doing to advance C&S's cause was fraudulent, because he had a fiduciary duty to reveal that information. *Id.* at 927. A similar argument could be made here: perhaps Bloom had a duty to tell the City that he was urging Komed to subvert Chicago's interests. Yet if failure to reveal one's breach of fiduciary duty were the sort of fraud that permits a criminal conviction under § 1341, then *every* breach of fiduciary duty would be a crime (provided that the mails or telephone were used)—a position that the second circuit disavowed. *Id.* at 926. It is best, we think, to divorce the holding of *Bronston* from some of the broader language deployed to justify it. Bronston misused both his public position and information derived from his private position in a way that Bloom is not alleged to have done; *Bronston* does not validate the intangible rights aspect of Count I.

 No one can be sure how far the intangible rights theory of criminal responsibility really extends, because it is a judicial gloss on § 1341. Congress told the courts in § 1346 to go right on glossing the mail fraud and wire fraud statutes along these lines. Given the tradition (which verges on constitutional status) against common-law federal crimes, and the rule of lenity that requires doubts to be resolved against criminalizing conduct, it is best to limit the intangible rights approach to the scope it held when the Court decided (and Congress undid) *McNally*. An employee deprives his employer of his honest services only if he misuses his position (or the information he obtained in it)

for personal gain. Count I does not allege that Bloom did this and therefore does not state an offense under the intangible rights theory.

### III

One other issue has so far gone unmentioned. Two months before dismissing the intangible rights aspects of Count I, the district judge severed Count I from the remaining counts of the indictment. The judge thought that Count I charges private misbehavior, while the remaining counts charge abuse of official powers (for example, accepting bribes). This implies that the counts were not properly joined under Fed. R.Crim.P. 8(a). Although the Criminal Appeals Act does not cover severance orders— and at all events the United States did not take a timely appeal from the order setting Count I for trial by itself—the prosecutor asks us to review this decision anyway as an exercise of pendent appellate jurisdiction.

*Abney v. United States*, 431 U.S. 651, 662–63, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), suggests that there is no such doctrine in criminal cases (at least when the main appeal is from an interlocutory rather than a final decision), and *Swint v. Chambers County Commission*, 514 U.S. 35, 43–51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995), questions whether it exists even in civil cases. Since *Swint* this court has not exercised pendent appellate jurisdiction in any case, civil or criminal. See *United States v. Indianapolis Board of School Commissioners*, 128 F.3d 507 (7th Cir.1997); *Cleveland Hair Clinic, Inc. v. Puig*, 104 F.3d 123 (7th Cir.1997); *IDS Life Insurance Co. v. SunAmerica, Inc.*, 103 F.3d 524 (7th Cir.1996); *In re Rimsat, Ltd.*, 98 F.3d 956, 964 (7th Cir.1996).

Several statutes, of which § 3731 is a good example, identify a limited group of orders that may be reviewed on interlocutory appeal. A discretionary appellate power to entertain additional issues would go a long way toward treating a list as an open-ended invitation. Although *United States v. Zafiro*, 945 F.2d 881, 885 (7th Cir.1991), *affirmed*, 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993), mentions the possibility of reviewing a severance order pendent to an appeal under § 3731, that statement was dictum under the definition we gave to that term in Part I above. *Zafiro* was an appeal by the defendant from a final decision. What we said about interlocutory prosecutorial appeals did not concern any issue in the case and was not informed by an adversarial presentation. *Zafiro* did not mention *Abney* and predates *Swint*; it therefore lacks authority on this subject. *United States v. Van Engel*, 15 F.3d 623, 629 (7th Cir.1993), which likewise states that pendent appellate jurisdiction in criminal cases is at least a possibility, is of little use to the prosecutor because it *dismissed* an effort by a defendant to present issues pendent to a prosecutor's appeal under § 3731. What is more, *Van Engel* suggests that only extraordinary circumstances would justify pendent appellate jurisdiction in a criminal case.

Like the Supreme Court in *Swint*, 514 U.S. at 51, 115 S.Ct. 1203, we postpone final resolution. Any exercise of pendent (ancillary, supplemental) jurisdiction is discretionary with the tribunal. Given our conclusion that the district court correctly dismissed the portion of Count I that carries the intangible rights banner, it is unnecessary to take up an additional issue in order to afford the prosecutor complete relief, for the prosecutor is not entitled to any relief at all. The appeal is dismissed to the extent it challenges the severance order, and the decision is otherwise affirmed.

BAUER, Circuit Judge, dissenting.

I respectfully dissent. Approaching the problem as the excellent opinion of Judge Easterbrook does creates the answer he proposes. Let me throw in an addendum: the majority states that "not every breach of a fiduciary duty works a criminal fraud." I agree. And then the opinion proposes a possible way to cope with the problem: to limit criminal prosecution "to cases in which the *defendant's* acts not only violated a fiduciary duty but also transgressed some other rule of law."

Now let me proceed. The relationship of attorney and client is one of contract. The lawyer gives advice—his stock in trade—and

receives a fee. In addition, his fees are earned by the soundness of his advice; he has a direct interest in the successful results of his advice not only for the present fee but to ensure he will continue to be employed as counsel in the future. When his advice concerns the purchase of property or property sold for taxes, he has—with or without a contingency fee arrangement—both a direct and an indirect interest in the enterprise upon which he is rendering advice.

I think the above statements are a fair and reasonable analysis of the attorney-client relationship as affects our present situation. And if we need a statutory act upon which to hang our judicial opinion, Illinois has given us one: Chapter 65 ILCS 5/3.1–55–10 reads as follows:

**Interests in contracts**

> (a) A municipal officer shall not be interested, directly or indirectly, in the officer's own name or in the name of any other person, association, trust, or corporation, in any contract, work or business of the municipality or in the sale of any article whenever the expense, price, or consideration of the contract, work business, or sale is paid either from the treasury or by an assessment levied by statute or ordinance. *A municipal officer shall not be interested, directly or indirectly, in the purchase of any property that (i) belongs to the municipality, (ii) is sold for taxes or assessments, or (iii) is sold by virtue of legal process at the suit of the municipality.* (emphasis added)

and later:

> (e) An officer who violates this Section is guilty of a Class 4 felony. In addition, any office held by an officer so convicted shall become vacant and shall be so declared as part of the judgment of the court.

(See also Munic. Code of Chicago, 2–156–110 (1997).)

It can be seen then that, totally apart from the fact the "advice" constituted a plan, illegal in both execution and result, to cheat the city out of a tax revenue (and therefore made the alderman liable under the law which prohibits depriving another of "the intangible right of honest service"), the action of the alderman/lawyer is criminally prohibited.

Having established that the defendant is charged with violating both an ethical and a possible criminal act, I believe the indictment passes muster and the dismissal—or partial dismissal—was in error. It is, of course, possible for the defendant to persuade a jury that he is not guilty of the crime charged; I only suggest the indictment *does* charge a crime under 18 U.S.C. § 1346. Advising a client as to how to commit an illegal act (as the indictment charges) is more than an ethical breach, even assuming the attorney giving the advice had no connection with the government. But for an alderman—a municipal official—to advise a client as to how he can illegally reduce his tax burden is, I believe, a clear violation of the laws of the State of Illinois. My concern is not with the alderman's ethics as a lawyer; that is a problem for the state. I am concerned when his activities as a lawyer involved a violation-criminal violation—of his duties as an alderman.

If we can say, as a court, that a lawyer in giving of advice for a fee, to a client as to how to complete an illegal transaction does not involve the lawyer having an interest, *direct or indirect,* in the transaction itself then we have provided a defense to chicanery and illegality that I refuse to accept.

Some years ago, we upheld the conviction of an alderman who did virtually what the defendant in this case did—used an illegal fiction to avoid the payment of taxes and to secure clear title to property. I see little difference (other than a margin of profit) between using the dummy to acquire property rights for oneself and advising a client as to how to avoid the tax—to cheat—for a legal fee. The allegation of the indictment charges the defendant with cheating the city of honest service owed to the city by virtue of his election and acceptance of public trust. If the allegation is true, the defendant is guilty of a felony under state law and a felony under 18 U.S.C. § 1346.

The law does not compel a municipal official to buy only in the city so as to pay maximum taxes; it does compel municipal officials to refrain from counseling or advising others, for a fee, to engage in illegal

activities which are detrimental to the interests of the city. Being a lawyer and giving legal advice does not permit the avoidance of the statutory duty to refrain from having an interest, direct or indirect, in "the purchase of property that is sold for taxes or assessments." That is what the indictment charges the defendant with doing.

The opinion describes the position of alderman as "part time." (I presume, by a logical extension, that also makes him a "part-time" lawyer.) Many county, state and municipal officials are entitled to hold outside employment, but only provided that such employment does not involve any possible conflict with the primary duty of honest service to the governmental entity to which they have been elected or appointed. When they put on their lawyer (or other) hat, they keep the yoke of public office around their necks. It is a known burden, voluntarily assumed, and seems necessary to preserve both faith in government—if there is any left—and at least a chance that government can function.

I would reverse the district court with directions to reinstate the entire indictment and set the matter for trial.